**This order is SIGNED.**

**Dated: October 24, 2024**

**PEGGY HUNT**
**U.S. Bankruptcy Judge**



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>BRADFORD KIRK BOHMAN,<br><br>Debtor. | Bankruptcy Case No. 24-22385<br><br>Chapter 11 (under Subchapter V)<br><br>Honorable Peggy Hunt |

## MEMORANDUM OPINION

This case presents the question of whether a retired anesthesiologist whose primary income is social security and who volunteers his time and efforts to a family enterprise in which he has no interest is "a person engaged in commercial or business activities" within the meaning of Section 1182(1)(A) of the Bankruptcy Code.[1] Based on the record outlined below, the Court concludes that the Debtor is not a person engaged in commercial or business activities and may not proceed under Subchapter V of Chapter 11. Accordingly, the *Objection to Debtor's Election to Proceed Under Subchapter V* (the "**Objection**"),[2] filed by Crusher Rental & Sales, LLC ("**Crusher**"), is sustained.

This *Memorandum Opinion* is the Court's findings of fact and conclusion of law pursuant to Federal Rule of Civil Procedure 52 made applicable here by Rules 7052 and 9014(c) of the

---

[1] 11 U.S.C. § 101 *et seq*. Unless otherwise stated all future references to the "Bankruptcy Code" are to title 11 of the United States Code.
[2] Docket No. 43.

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").[3] A separate *Order* will be entered concurrently herewith.

## I.     JURISDICTION AND VENUE

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 157(a) and 1334, as well as the District Court's Order of Reference at DUCiv R 83-7.1. Pursuant to 28 U.S.C. § 157(b), the Court may hear and determine Crusher's Objection by entry of a final order because it is a core proceeding as it arises under the Bankruptcy Code, arises in the above-captioned bankruptcy case, and is included in the definition of a core proceeding in 28 U.S.C. § 157(b)(2)(A) and (O). Venue of this case in this district is proper pursuant to 28 U.S.C. § 1408.

## II.    FINDINGS OF FACT

The Debtor and his brother Brent Bohman ("**Brent**") testified at an evidentiary hearing held on September 3, 2024.[4] The parties also stipulated to the admission of Crusher's Exhibits 1-13 and Debtor's Exhibits A-J.[5] The Court makes the following findings of fact based on the evidence received and the record in this case.

### 1.     The Debtor's Subchapter V Election, Income and Debt

The Debtor filed a *Petition* seeking relief under Chapter 11 of the Bankruptcy Code on May 17, 2024 (the "**Petition Date**"). He represented in relevant part: "I am a debtor according to

---

[3] Findings of fact herein are also deemed, to the extent appropriate, to be conclusions of law, and conclusions of law herein are similarly deemed to be findings of fact and shall be equally binding as both.

[4] Docket No. 87 (Audio Recording of Debtor Testimony (hereinafter "**Dr. Tes.**")); *id*. (Audio Recording of Brent Testimony (hereinafter "**Brent Tes.**")).

[5] The *Table of Contents* accompanying Crusher's Exhibits incorrectly identified Exhibit 12 as a loan application; Exhibit 13 as an engagement letter; and Exhibit 14 as law firm billing records. The loan application, however, is marked as Exhibit 14, and the engagement letter and time sheets are marked as Exhibits 12 and 13, respectively. The Debtor's stipulation to the admission of Crusher's Exhibits was based on the listing in the Table of Contents. The Court refers to the Exhibits as marked. The admission of Exhibits marked as 1-13 were stipulated to, but not the loan application marked as Exhibit 14.

the definition in § 1182(1) of the Bankruptcy Code, and I chose to proceed under Subchapter V of Chapter 11" (the "**Subchapter V Election**").[6]

The Debtor is by profession an anesthesiologist who retired from the practice of medicine in approximately 2021.[7] In his *Schedules*[8] and *Statement of Financial Affairs*,[9] the Debtor states that he is not employed and that his primary source of monthly income is social security.[10] After expenses, the Debtor has $885.14 in net monthly income. His expenses are personal in nature.[11]

Gross income from employment in 2022 was in the total amount of $2,750, not from the Debtor operating a business, but "[w]ages, commissions, bonuses, tips[.]" The Debtor reports no employment income in 2023. The only other annual income reported is social security for 2023 and the pre-petition period of 2024.[12]

The Debtor has approximately $6.5 million in ERISA-qualifying retirement accounts (the "**Retirement Accounts**"). The Retirement Accounts are claimed as exempt, and the Debtor maintains they are not property of his estate. The Debtor is not required to take minimum distributions from the Retirement Accounts until January 2026.[13]

---

[6] Ex. 1 (Pet., at 4, ¶ 13).
[7] *See* Ex. 4 (Docket No. 17 (Plan of Reorganization Dated June 11, 2024 (the "**Initial Plan**"), at p. 2)).
[8] Ex. 2 (Docket No. 4 (Schedules filed May 17, 2024 (the "**Initial Schedules**")). The Initial Schedules were amended on June 12, 2024 (the "**1st Am. Sched.**"), and on July 17, 2024 (collectively, with the Initial and 1st Am. Sched., the "**Schedules**"). *See* Docket Nos. 18, 40.
[9] Ex. 3 (Docket No. 4 (Statement of Financial Affairs (the "**SOFA**")). The SOFA was amended on June 12, 2024. The amendments are not material to this matter. *See* Docket No. 18.
[10] Initial Schedule I, ¶ 8(e); Exs. 6 & 7 (Monthly Oper. Reports for June and July 2024, at pp. 5 - 6). Other monthly income in the amount of $250 from What a Find, LLC, an entity in which the Debtor has a 12.5% ownership interest, is also listed. Initial Schedule I, ¶ 8(h); Initial Schedule and 1st Am. Sched. A/B, at ¶ 19; *see* Exs. 6 & 7 (Monthly Oper. Reports for June and July 2024, at p. 5). This entity, which is not described, *see* SOFA, ¶ 27, is not discussed further herein because there is no evidence that it is a business supporting the Debtor's claimed commercial or business activities.
[11] Initial Schedule J; Exs. 6 & 7 (Monthly Oper. Reports for June and July 2024, pp. 6-7).
[12] SOFA, ¶¶ 4, 5.
[13] Initial Schedule and 1st Am. Sched. A/B, ¶ 21; *id.*, Schedule C; Initial Plan, at pp. 2, 3; Exs. 11 & J (Docket No. 79 (Plan of Reorganization Dated August 28, 2024 (the "**Third Plan**"), at p. 3)).

Crusher is a general unsecured creditor that has been scheduled by the Debtor as holding a disputed claim in the amount of approximately $936,000.[14] This claim results from a *Judgment* entered against the Debtor and his wholly owned company, Bohman Aggregates, LLC ("**Aggregates**") discussed in further detail below.[15] The Debtors other significant creditors include family members and insider Bohman Ranch, LLC ("**Ranch**").[16]

2.  **Aggregates**

Aggregates is a Utah limited liability company that was formed in 2014 and was an entity in good standing on the Petition Date. The Debtor is Aggregates' sole member and manager, and Aggregates is included in the Debtor's most recent tax returns.[17]

Aggregates was formed for the purpose of extracting sand and gravel products from land owned by Ranch. It commenced operations in October 2014, using Crusher's equipment to operate its business. A contract dispute arose between Aggregates and Crusher and in February 2015 Crusher filed a *Notice of Oil Gas and Mining Lien* ("**Crusher's Lien**") against the interests of Aggregates and Ranch.[18]

Aggregates ceased extracting minerals on Ranch's land sometime in early 2015 after Crusher's Lien was recorded and it has not had any further mining operations. It has no employees and no assets to pay creditors, other than an alleged claim against Crusher that, as discussed below, has been dismissed. Aggregates has not generated revenue in at least eight

---

[14] Schedules E/F, ¶ 4.7.
[15] Schedules E/F, ¶ 4.7; Docket No. 3 (List of Creditors - 20 Largest Unsecured Claims); Ex. B (Judgment); 1st Am. Sched. A/B, ¶ 19 (Debtor's interest in Aggregates was not disclosed in Initial Schedule A/B); SOFA, ¶ 27; Ex. 8 (Periodic Report, at p. 1); Ex. 10 (Docket No. 68 (Declaration dated Aug. 9, 2024, attached to Response (hereinafter, "**Debtor Dec**.")), at ¶ 3); Dr. Tes., at 10:04–10:05 & 10:51–10:52 a.m.
[16] Initial Schedule and 1st Am. Sched. D; Schedules E/F, ¶¶ 4.2, 4.9; *see* Debtor Dec., ¶¶ 10-12.
[17] SOFA, ¶ 27; Debtor Dec., ¶ 4; Ex. A (Oper. Agreement, at ¶ 3 & Ex. A); Ex. 1 (Pet., at p. 10); Dr. Tes., at 9:50 a.m. Information showing Aggregates in is good standing with the Division of Corporations and Commercial Code was represented to be attached to the Response. *See* Docket No. 68, at ¶ 6. This information was not attached, but this fact is not in dispute and is supported by SOFA, ¶ 27.
[18] Debtor Dec., ¶¶ 4, 5, 6; Dr. Tes., at 9:52 a.m.; Brent Tes., at 11:18 a.m.; *see* Ex. B (Judgment, ¶ 4).

years. When operating, Aggregates lost money, and the Debtor never received money from Aggregates. In 2023, Aggregates had no income other than nominal interest income, and it had no income for the period in 2024 prior to the Petition Date.[19]

### 3. Ranch and the GWM Entities

Ranch is a limited liability company that owns approximately 3,000 to 4,000 acres of rural land in Morgan County, Utah. The Debtor owned a 20% interest in Ranch until 2011 or 2012 when his interest was transferred to Great Western Management LLC ("**GWM LLC**"), an entity that is wholly owned by Great Western Management Trust (the "**GWM Trust**") (collectively, the "**GWM Entities**"). On the Petition Date, the Debtor had no membership interest in Ranch and no beneficiary interest in the GWM Trust.[20]

With his brothers, including Brent, the Debtor is a manager of Ranch and serves as its registered agent. The Debtor is also a manager of the GWM Trust and possibly GWM LLC.[21] The Debtor is not an employee of Ranch or the GWM Entities, he is not compensated for work he is doing, and he receives no monies from these entities.[22] His personal expenses and debts are not the result of his management of these entities.[23]

### 4. The State Court Action and the Appeal

In 2015, Aggregates filed a lawsuit in state court against, among others, Crusher (the "**State Court Action**"). The Debtor, a guarantor of Aggregates' obligations, and Ranch also became parties to the State Court Action, which involved a dispute concerning the contractual

---

[19] Dr. Tes., at 9:52–9:53, 10:38-10:41 a.m.; Brent Tes., at 11:17–11:19 a.m.; *see* Ex. B (Judgment); Ex. 8 (Periodic Report, at pp. 4, 5).
[20] Dr. Tes., at 10:00, 10:34, 10:50, 11:03 a.m.; Brent Tes., at 12:25 p.m.; Ex. I (GWM LLC Oper. Agreement dated as of Sept. 14, 2011, at p. 10); Initial Schedule and 1st Am. Sched. A/B; SOFA (no interests disclosed).
[21] Dr. Tes., at 9:58, 10:10, 10:13, 10:34, 10:50 a.m.; *see* Ex. I (GWM LLC Oper. Agreement dated as of Sept. 14, 2011, at pp. 1, 10).
[22] Dr. Tes., at 10:50–10:51, 11:07–11:09 a.m.; *see* Initial Schedule I (no income); SOFA, ¶¶ 4-5 (same); Initial Plan, at p. 3 ("all . . . present income is derived from Social Security payments . . .").
[23] *See* Schedules E/F; Initial Schedule & 1st Am. Sched. J.

arrangement for Aggregates' use of Crusher's equipment and disputes related to Crusher's Lien.[24]

A jury verdict was entered in favor of the Debtor, Aggregates, and Ranch in 2018 in the amount of approximately $1,400,000. The trial court, however, declared a mistrial which was subsequently affirmed on appeal.[25]

A second jury trial was held and in May 2023 the trial court entered a *Judgment*, among other things: (i) awarding damages to Crusher against the Debtor and Aggregates, jointly and severally; (ii) vacating Crusher's Lien; and (iii) dismissing "[a]ll other claims and causes of action of all parties not previously resolved by Court order herein . . . ."[26] The Judgment was appealed by Debtor and Aggregates and that appeal, which is discussed below, was pending on the Petition Date.[27]

### 5. The Debtor's Proposed Plans of Reorganization

The Debtor filed a *Plan of Reorganization Dated June 11, 2024* (the "**Initial Plan**"),[28] proposing to pay creditors over a five-year period solely from two sources: (i) a portion of his social security, until January 2026, and (ii) then starting in January 2026, a portion of his social security and minimum distributions from his Retirement Accounts.[29] At page 2 of the Initial Plan, the Debtor represented that his "circumstances are somewhat unusual" because he was "voluntarily" funding his plan with funds that are exempt or not property of his estate. He also states in relevant part: "The Debtor and Aggregates are actively prosecuting an appeal of [the Judgment] and believe the judgment will be reversed on appeal and will likely result in a future

---

[24] Debtor Dec., ¶ 6; Dr. Tes., at 10:03–10:05 a.m.; Brent Tes., at 11:13–11:15 a.m.; *see* Initial Plan & Third Plan, at p. 2.
[25] Debtor Dec., ¶ 7.
[26] Ex. B (Judgment); *see* Debtor Dec., ¶ 8.
[27] Debtor Dec., ¶ 9; SOFA, ¶ 9.
[28] Ex. 4 (Docket No. 17).
[29] Initial Plan, at p. 3 and Ex. A.

third trial." The Initial Plan does not discuss the Debtor's potential recoveries if the Judgment is reversed on appeal and Aggregates is successful in a third trial against Crusher, and the Debtor does not propose contributing any recoveries to fund the Initial Plan.

After Crusher's Objection to his Subchapter V Election was filed, the Debtor amended the Initial Plan by filing a *Plan of Reorganization Dated August 9, 2024* (the "**Second Plan**").[30] Therein, the Debtor stated that in addition to funding the Plan through social security and portions of minimum distributions from his Retirement Accounts, he would contribute any recoveries that he either directly or indirectly obtained through Aggregates from Crusher in the State Court Action.[31]

The Second Plan was then amended prior to the hearing on Crusher's Objection. In a *Plan of Reorganization Dated August 28, 2024* (the "**Third Plan**"),[32] the Debtor redlined the Second Plan as follows:

> If the Debtor is able to recover any money on account of ~~his~~the claims in the State Court Litigation~~, whether directly through his individual claims, or indirectly~~ through his 100% ownership interest in Aggregates, any such proceeds will be used to accelerate payments due under the Plan . . . .
>
> [. . . .]
>
> <u>The Debtor also is actively considering reactivating Aggregates mining operation at the Bohman Ranch, and similarly any profits the Debtor receives on account of those mining operations through his ownership in Aggregates would be first to the Holders of Secured Claims until their Claims are satisfied in full, and next to the Holders of Claims other than Secured Claims until their Claims are satisfied in full.</u>[33]

---

[30] Docket No. 65.
[31] Second Plan, at pp. 3, 13–14.
[32] Exs. 11 and J (Docket No. 79).
[33] Third Plan, at p. 3; *see id*. at pp. 13–14.

### 6. Alleged Commercial or Business Activities

As noted above, the Debtor is retired from his profession. Aggregates, the only relevant entity in in which he has an ownership interest,[34] was not operating on the Petition Date. The Debtor maintains that, for reasons discussed below, he is engaged in commercial or business activities through Aggregates.

The Debtor also argues that he engages in commercial or business activities through Ranch and the GWM Entities. The Debtor admits that a lot his time is spent working on behalf of Ranch. He states that he is engaged part-time from January through March and full-time from April through December actively managing Ranch and the businesses of Ranch, including: (i) managing a hunting business; (ii) bookkeeping with the assistance of a professional accounting firm that does tax returns; (iii) assisting in managing and running a cattle grazing business; (iv) assisting in the process of developing a small subdivision on Ranch's land; (v) maintaining roads and equipment; (vi) holding regular meetings with Ranch members to keep them informed; (vii) managing noxious weeds on Ranch's land, including on the land formerly mined by Aggregates; (viii) trying to find a new mine operator; and (ix) assisting with the appeal of Crusher's Judgment on behalf of Ranch.[35]

Additionally, outside the time he spends on behalf of Ranch, the Debtor estimates spending 15 hours annually doing work on behalf of one or both of the GWM Entities. He manages all investments, including a tire recycling company, investments in a filtration system, and investments in businesses and stocks.[36]

---

[34] *See supra.* n.10.
[35] Debtor's Supp. Br., p. 5; Dr. Tes., at 9:58–10:33, 10:41–10:42, 10:51–10:53, 10:58–11:06 a.m.; *see* Brent Tes., at 11:13–11:16 a.m.; Exs. E – H.
[36] Dr. Tes., at 10:34–10:36 a.m.

The Debtor receives no income for these activities, and none of these activities will result in income to pay his creditors. He does the activities on behalf of Ranch for free "out of a sense of obligation because of the mess [he] created due to the activities of Bohman Aggregates."[37]

### 7. The Present Objection

Crusher filed its Objection to invalidate the Debtor's Subchapter V Election, arguing that the Debtor is not engaged in commercial or business activities as required under Section 1182(1)(A) of the Bankruptcy Code. *Notice* of the Objection and of hearing was filed and properly served, and no further notice is required.[38] The Debtor filed a *Response* to the Objection contesting the allegations and relief sought.[39]

At an initial hearing, the Court heard preliminary argument and continued the hearing to allow for supplemental briefing and an evidentiary hearing.[40] At the conclusion of the evidentiary hearing, the Court took the matter under advisement.

### III.    CONCLUSIONS OF LAW

Section 103(i) of the Bankruptcy Code states that "Subchapter V of chapter 11 of this title applies only in a case under chapter 11 in which a debtor (as defined in section 1182) elects that subchapter V of chapter 11 shall apply." Bankruptcy Rule 1020(a) instructs that the election is made by the debtor in its voluntary petition. The petition requires the debtor to represent that it is a "debtor according to the definition in § 1182(1) of the Bankruptcy Code . . . ."[41] Section 1182(1)(A), in turn, defines the term "debtor" to mean in relevant part, "a person engaged in

---

[37] Dr. Tes., at 11:05–11:10 a.m.
[38] *See* Docket Nos. 49, 50.
[39] Docket No. 68.
[40] *See* Docket No. 73 (Scheduling Order); Docket No. 82 (Dr.'s Supp. Br.); Docket No. 85 (Crusher's Supp. Br.).
[41] Official Form 101, ¶ 13.

commercial or business activities" with debts "not less than 50 percent of which arose from the commercial or business activities of the debtor. . . ."

Parties in interest may object to a debtor's subchapter V election within the periods set forth in Bankruptcy Rule 1020(b). Upon timely objection, the Debtor has the burden of proving eligibility under Section 1182(1).[42]

In its timely Objection to the Debtor's Subchapter V Election, Crusher argues that the Debtor is not eligible for relief under subchapter V of Chapter 11 because he does not meet the definition of "debtor" under Section 1182(1)(A) quoted above. There is no issue that not less than 50 percent of the debts scheduled by the Debtor "arose from" commercial or business activities. The question in this case is whether the Debtor is a "person engaged in commercial or business activities." The Court must begin its analysis of this phrase by looking at the language of Section 1182(1)(A) itself.[43]

The Court starts with the phrase "person engaged in." Based on the definition of the word "person" in Section 101(41), both individuals and entities may be subchapter V debtors. A plain reading of the phrase "engaged in" in the context of the Bankruptcy Code requires the debtor to be or "actively and currently involved" in the commercial or business activities on the date it filed its bankruptcy petition.[44]

---

[42] *In re Offer Space, LLC*, 629 B.R. 299, 304 (Bankr. D. Utah 2021) (Thurman, J.); *accord In re Power Block Coin, LLC*, Case No. 24-23041, 2024 WL 4456657, at *2 (Bankr. D. Utah filed Oct. 9, 2024) (Marker, J.) (citing *Bridle Path Partners, LLC*, Case No. 23-23960, 2024 WL 86601, at *3 (Bankr. D. Utah filed Jan. 8, 2024) (Anderson, C.J.)); *see First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 705 (10th Cir. 2008) (Chapter 12 has burden to prove eligibility under § 109(f)).

[43] *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (interpretation of the Bankruptcy Code begins with "the language of the statute itself"); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (same); *Offer Space*, 629 B.R. at 305 (same).

[44] *Offer Space*, 629 B.R. at 305-06 (quoting *In re Thurmon*, 625 B.R. 417, 422 (Bankr. W.D. Mo. 2020) (analyzing the Bankruptcy Code and the cases)); *accord In re Fama-Chiarizia*, 655 B.R. 48, 62 (Bankr. E.D.N.Y. 2023); *In re McCune*, 635 B.R. 409, 420 (Bankr. D. N.M. 2021); *In re Ikalowych*, 629 B.R. 261, 280–84 (Bankr. D. Colo. 2021).

Next, the Court turns to the meaning of the phrase "commercial or business activities." Because this phrase is not defined in the Bankruptcy Code, courts typically look at the common meaning of the words in the phrase.[45] The word "commercial" is "of, in or relating to commerce"[46] and "commerce" means "the exchange of buying and selling commodities."[47] "Business" means "commercial or mercantile activity engaged in as a means of livelihood" or "dealings or transactions especially of an economic nature."[48] Finally, the word "activity" means "the quality or state of being active: behavior or actions of a particular kind."[49] Because the word is plural, it indicates "continuous, recurring or ongoing action."[50]

Courts apply the above definitions in the context of the "totality of the circumstances" of the case.[51] This test requires looking at all the facts and circumstances of the debtor's particular situation and what activities the debtor was engaged in as of the petition date.[52] Examining the facts and circumstances in this case and applying them to the meaning of the words and phrases in Section 1182(1)(A), the Court concludes that, even under a broad interpretation of the statute,[53] the Debtor has not met his burden of establishing that he was "engaged in commercial or business activities" on the Petition Date.

---

[45] *See, e.g*, *Offer Space,* 629 B.R. at 305, *quoted in In re Blue,* 630 B.R. 179, 190 (Bankr. N.D.N.C. 2021); *Ikalowych*, 629 at 276–278.
[46] Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/commerical (hereinafter, "**Merriam-Webster**"), *quoted in Offer Space*, 629 B.R. at 305.
[47] Merriam-Webster/dictionary/commerce, *quoted in Offer Space*, 629 B.R. at 305.
[48] Merriam-Webster/dictionary/business, *quoted in Offer Space*, 629 B.R. at 305.
[49] Merriam-Webster/dictionary/activity, *quoted in Offer Space*, 629 B.R. at 305.
[50] *Ikalowych*, 629 B.R. at 277.
[51] *Offer Space*, 629 B.R. at 306.
[52] *See In re Fama-Chiarizia*, 655 B.R. 48, 67–68 (Bankr. E.D.N.Y. 2023); *Ikalowych*, 629 B.R. at 283.
[53] *See, e.g., In re RS Air, LLC*, 638 B.R. 403, 410 (9th Cir. B.A.P. 2022); *Fama-Chiarizia*, 655 B.R. at 67; *Ikalowych*, 629 B.R. at 276–277; *see also Offer Space*, 629 B.R. at 305 (doubts resolved in debtor's favor).

1. **The Debtor is Not Personally Engaged in Commercial or Business Activities.**

The Debtor is a retired individual whose income is and has been, for at least the last two years, social security. His expenses are personal in nature and not tied to a business. The Debtor, therefore, is not personally engaged in commercial or business activities because he has does not trade in commodities and he has no occupation or employment habitually engaged in for livelihood or gain.

2. **The Debtor is Not Engaged in Commercial or Business Activities Through Ranch or the GWM Entities Because Volunteerism is Not a Commercial or Business Activity.**

An individual debtor who elects to proceed under subchapter V may establish commercial or business activities by "bridging the gap" between it and a separately owned non-debtor business.[54] The Debtor is not engaged in commercial or business activities through Ranch or the GWM Entities under Section 1182(1)(A).

At the time he filed his petition, the Debtor was actively working for and managing Ranch and the GWM Entities and admits that his work for Ranch alone was basically his full-time occupation for a good part of the year. The Debtor has no interests in Ranch or the GWM Entities, he earns no money for his work, and income generated by these entities will not fund the Debtor's reorganization efforts. None of his personal debts involve these entities.

This volunteer work on behalf of Ranch and the GWM Entities are "activities," but under the defined terms discussed above, they are not "commercial" activities because they do not involve the exchange of buying and selling commodities. Additionally, they are not "business" activities because the work is not a means of livelihood, employment or gain for the Debtor. The

---

[54] *Offer Space,* 629 B.R. at 311.

Debtor therefore has not established that he is personally engaged in commercial or business activities through Ranch or the GWM Entities.

In so holding, the Court acknowledges that a profit motive is not required to qualify as a commercial or business activity.[55] But, as discussed, volunteerism is not a commercial or business activity under the plain meaning of Section 1182(1)(A). The Debtor, appears to recognize this fact, stating in part that commercial or business activities must be "undertaken for the purpose of earning income" and that "people who do not put their own capital at risk" are not eligible for subchapter V relief.[56]

The Court's conclusion that volunteerism is not a commercial or business activity is supported by *In re Bennion*,[57] where the court examined whether the debtors' debts "arose" from "commercial or business activities" under Section 1182(1)(A). Applying the above definitions, the court in *Bennion* concluded that commercial or business activity does not exist when a debtor provides services to his family at no charge for personal or family purposes.

3. **The Debtor Has Not Met His Burden of Showing That He is Engaged in Commercial or Business Activities Through Aggregates.**

The Debtor has an ownership interest in Aggregates and, therefore, it may be an entity through which he could establish eligibility as a debtor under Section 1182(1)(A). This is true even though Aggregates has not operated since 2015. Numerous courts, including in this district in *In re Offer Space, LLC*,[58] have held that a non-operating entity may be a subchapter V debtor or may be an entity to which an individual subchapter V debtor "tethers" itself to establish it is

---

[55] *See, e.g., RS Air*, 638 B.R. at 413; *In re Ellingsworth Residential Cmty., Ass'n, Inc.*, 619 B.R. 519, 521 (Bankr. M.D. Fla. 2020).
[56] Debtor's Supp. Br., at p. 13 (discussing *Ikalowych*, 629 B.R. at 276, 287).
[57] Case No. 22-00102, 2022 WL 3021675 (Bankr. D. Idaho filed July 29, 2022).
[58] 629 B.R. 299 (Bankr. D. Utah 2021).

engaged in commercial or business activities.[59] The Debtor, therefore, must show that he was engaged in commercial or business activities through Aggregates on the Petition Date.

It should first be noted that the fact that more than 50 percent of the Debtor's personal debt involves Aggregates is relevant, but it does not establish eligibility under Section 1182(1)(A) because that Section plainly requires a showing of "commercial or business activities" in *two* contexts. The Debtor must be engaged in such activities through the non-debtor entity which, as discussed above, is inherently "contemporary in focus and not retrospective,"[60] *and* his debts must have arisen from such activities, which is retrospective. Thus, being eligible because debts arose from commercial or business activities does not, in and of itself, establish being engaged in commercial or business activities.

The Debtor asserts that he is engaged in commercial or business activities through Aggregates based on the following activities: (1) reclamation work; (2) his intent to explore the possibility of Aggregates resuming mining operations; and (3) his work on the appeal. The Court concludes that the Debtor has not met his burden of proving that he is engaged in commercial or business activities through Aggregates based on these activities for the reasons stated below.

    A. *The Debtor Did Not Prove that Aggregates has Reclamation Obligations or that His Work was on Behalf of Aggregates.*

The Debtor states that he spends approximately 80 hours annually managing noxious weeds on Ranch's land because Aggregates has reclamation obligations. The Debtor, however, did not credibly establish that Aggregates has reclamation obligations. Aggregates did not operate on Ranch's land pursuant to a written lease agreement. It asserts it had a verbal agreement based on a written agreement between Ranch and a company that had previously

---

[59] *Id.* at 310; *see Fama-Chiarizia*, 655 B.R. at 68; *Blue*, 630 B.R. at 179; *Ikalowych*, 629 B.R. at 261.
[60] *RS Air*, 638 B.R. at 410.

mined Ranch's land. The alleged reclamation obligations are claimed to have arisen, not because Aggregates assumed them from the predecessor, but because Aggregates verbally agreed to operate under terms similar to the predecessor's agreement which Brent drafted and was not in evidence.[61] Accordingly, the Debtor did not establish that Aggregates has reclamation obligations through which he can base commercial or business activities.

Even if the Debtor had shown Aggregates has reclamation obligations, which he did not, the Debtor's reclamation work for Aggregates was not credibly established. Reclamation was not mentioned as a business activity the Debtor performs for Aggregates in the *Declaration* he filed in support of his Response to Crusher's Objection.[62] It is admitted that the Debtor manages noxious weeds for Ranch, and neither the Debtor nor Brent distinguished the weed maintenance the Debtor performs on behalf of Ranch from the weed maintenance he allegedly performs for Aggregates. Brent testified that in addition to weeding, Aggregates maintains roads around the mine site and has been involved in erosion and water control.[63] The Debtor did not mention these activities, and Brent did not establish how these activities are related to the Aggregates' alleged reclamation obligations or why Aggregates would be engaged in these activities on land that it does not own and on which it no longer operates. For all these reasons, the Debtor has not proven that reclamation is a business activity of Aggregates or that the Debtor was acting on behalf of Aggregates.

---

[61] Dr. Tes., at 9:54–9:56, 10:02, 11:01–11:05 a.m.; *see* Brent Tes., at 12:26–12:43 p.m.
[62] *See* Ex. 10 (Debtor Dec.).
[63] Brent Tes., at 11:19–11:21 a.m.

    B. *The Debtor Did Not Show that He Was Planning to Recommence Aggregates' Mining Operations Prior to the Petition Date or that Work to Recommence Mining on Ranch's Land was on Behalf of Aggregates.*

The Debtor asserts that he is engaged in business activities on behalf of Aggregates based on the possibility that Aggregates could recommence mining operations. Although the "possibility" of an entity recommencing operations may, under the right circumstances, be "business activities" under Section 1182(1)(A),[64] the facts here do not support such a conclusion.

There is no evidence to establish that the Debtor, acting for Aggregates, had an intent to recommence business operations prior to or on the Petition Date. While the Debtor states he has spent "probably" 20-25 hours related to recommencing mining,[65] he did not articulate whether these hours were spent prior to the Petition Date or as discussed in a moment, if the time was even on behalf of Aggregates. Brent, in response to the Court's inquiry about timing, stated that the conversations were post-petition and then added that there had "probably" been discussions of resuming mining operations prior to the Petition Date.[66] Based on Brent's demeanor and the timing of when the idea of recommencing operations was raised, the Court does not find it credible that the Debtor had an intent to recommence operations for *Aggregates* on the Petition Date. The possibility of restarting Aggregates' operations was not part of the Initial Plan. In the *Declaration* filed in response to Crusher's Objection, the Debtor stated he "intend[ed] to explore the possibility of Aggregates resuming mining" if the outcome of the State Court Action was favorable.[67] There was no mention made of this in the Debtor's Second Plan filed the same day.

---

[64] *See, e.g., Ikalowych*, 629 B.R. at 284 (individual debtor engaged in business activities in part because he showed his "intention to continue to operate" his wholly owned company, including that the company had recently entered into a business consulting agreement).
[65] Dr. Tes., at 9:57 a.m.; *see id*., at 10:17 a.m.
[66] Brent Tes., 12:49–12:50 p.m.
[67] Debtor Dec., at ¶ 13.

Then, on the eve of the evidentiary hearing on Crusher's Objection and 103 days after the Petition Date, that the Debtor amended the Second Plan and, seemingly modifying his earlier statement in his Declaration, stating in the Third Plan quoted above that he was "actively considering reactivating Aggregates' mining operation . . . ."

Furthermore, the Debtor's assertion that he is presently or actively considering working on behalf of Aggregates to find an operator for the mine is not consistent with the facts. Ranch presently is looking for a new mine operator and it does not need Aggregates to mine the land. Ranch will not engage with Aggregates on resuming mining operations until the State Court Action is resolved.[68] The Debtor stated that he would consider the possibility of Aggregates resuming operations if there was a favorable outcome in the State Court Action.[69] With the State Court Action still before the appellate court, it does not make sense that the Debtor has been or is working on behalf of Aggregates to recommence mining operations.

Finally, the Debtor says he spends time identifying operators who have expressed an interest in operating the mine and directing them to Brent. Brent confirmed that he has spoken to a number of potential operators, but that the Debtor had not been "100% directly involved . . . basically just discussions about what's going on and what we're doing."[70]

    C. *The Debtor is Not Engaged in the Appeal, or the Appeal is Not a Business Activity.*

Aggregates' only activity that potentially may be imputed to the Debtor is the appeal of the Judgment that was pending on the Petition Date. There are numerous cases holding that actively pursuing litigation on behalf of a non-operating entity is a business activity within the

---

[68] Dr. Tes., at 10:00–10:02, 10:17, 10:39–10:46 a.m.; Brent Tes., at 11:21–11:24 a.m., 12:20–12:24 p.m.
[69] Dr. Tes., at 10:42–10:43 a.m; Debtor Dec., ¶ 13.
[70] Dr. Tes., at 10:17 a.m.; Brent Tes., at 11:21–11:22 a.m., 12:50–12:51 p.m.

meaning of Section 1182(1)(A).[71] In the right circumstances, the Court agrees that litigation may be a basis for determining that a debtor is engaged in business activity. This case does not present those circumstances.

Pre-petition the Debtor spent time assisting attorneys with discovery, trial testimony and an appellate mediation statement, consulting with Brent and other attorneys, and attending a mediation. On the Petition Date, mediation of the appeal had concluded, and the only tasks remaining were drafting appellate briefs and making oral argument that likely will not take place until sometime in 2025.[72]

Although the Debtor testified that he spends five hours per week working on the appeal,[73] the invoices and time sheets of appellate counsel who was engaged pre-petition show that between May and July 2024 (after the Petition Date), the Debtor was involved in one conference with the appellate lawyer and his brother Brent that lasted less than one hour. Brent, who is an attorney and claims to be an "informal manager" of Aggregates, is the primary person interfacing with counsel.[74] The Debtor's litigation time is also on behalf of Ranch, and he cannot allocate his time between Ranch and Aggregates.[75] Ranch, not the Debtor or Aggregates, is funding the appeal,[76] and Brent does not charge the Debtor or Aggregates for his legal work.[77] The Debtor also did not propose potential litigation recoveries as funds he would use to fund his plan until after Crusher's Objection was filed.

---

[71] *See, e.g., In re Port Arthur Steam Eng., L.P.*, 629 B.R. 233, 237 (Bankr. S.D. Tex. 2021); *accord Fama-Chiarizia*, 655 B.R. at 70–72.
[72] Dr. Tes., at 10:06–10:10, 10:43, 10:48–10:50, 10:55–10:58 a.m.
[73] Dr. Tes., at 10:52 a.m.
[74] Ex. 13 (time sheets for period May through July 2024); *see* Ex. D (invoice dated June 4, 2024); Brent Tes., at 11:24–11:26 a.m.
[75] Dr. Tes., at 10:50–10:53, 10:58–10:59 a.m.
[76] Exs. 12 & C (engagement ltr. dated April 4, 2024); Ex. 9 (App. of Bradford Bohman to Employ Special Counsel, ¶ 13); Initial Schedule and 1st Am. Sch. E/F, at ¶ 4.2 (scheduled pre-petition debt owed to Ranch for legal fees).
[77] Brent Tes., at 12:46–12:50 p.m.

In short, the Debtor was not presently or actively involved in litigation on behalf of Aggregates on the Petition Date. As noted above, the term "engaged in" is "inherently contemporary in focus and not retrospective"[78] and, therefore, does not include the pre-petition tasks the Debtor described. His work since the Petition Date has been negligible and he has not shown otherwise. Going forward the Debtor, who is not an attorney, will not have a significant role given the timing of the appeal and the nature of appellate work. He, therefore, is not "engaged in" the activity. It is also uncertain that the appeal on its own can be "activities" that qualify under Section 1182(1)(A) because the appeal does not involve continuous and ongoing work by the Debtor. The Debtor, therefore, has not met his burden of showing that he is "engaged in" the appeal on behalf of Aggregates or that the appeal on its own can serve as "activities" based on the facts in this case.[79]

Cases holding that non-operating entities involved in litigation have business activities generally focus on litigation being an activity, not on whether a debtor is "engaged in" the litigation. Additionally, these cases conclude that litigation is a business activity based on very different facts than in this case, such as the entity being the debtor directly involved in litigation;[80] litigation being one of several activities of an individual debtor; or ongoing contentious trial litigation.[81]

---

[78] *RS Air*, 638 B.R. at 410.

[79] There is nothing in this case to suggest that the litigation will result in any return to creditors under the five-year term of the Third Plan. Specifically, the Debtor and Aggregates need to prevail on appeal which will likely not even be argued until 2025; if the appeal is successful and Aggregates' dismissed claims against the defendants are reinstated (the Debtor does not have affirmative claims), Aggregates must retry the State Court Action and obtain a judgment against the defendants; and Aggregates must collect on any such judgment and have sufficient surplus funds to make a distribution to the Debtor. *See* Utah Code Ann. § 48-3a-405.

[80] *See, e.g., RS Air*, 638 B.R. at 409–15; *Offer Space*, 629 B.R. at 303; *Port Arthur*, 629 B.R. at 237.

[81] *See, e.g., Fama-Chiarizia*, 655 B.R. at 70 (citing *In re Hillman*, 2023 WL 3804195 (Bankr. N.D.N.Y. filed June 2, 2023); *In re Vertical Mac Const., LLC*, 2021 WL 3668037 (Bankr. M.D. Fla. Filed July 23, 2021)).

This case is more akin to *In re McCune*.[82] The subchapter V debtors' income in that case was social security and monies from a family trust. The three limited liability companies they owned were not operating and did not have assets, revenues or employees. One of the companies was "defending claims in state court litigation by filing an appeal of an adverse judgment against" the company and the debtors.[83] The debtors asserted that if the appeal was successful, they "would consider reactivating [the company's] business operations."[84] The court in *McCune* concluded that the appeal of the adverse judgment "is not by itself enough" to find that the debtors were engaged in commercial or business activities under Section 1182(1)(A).[85] Similarly, for the reasons stated, the Court concludes that the appeal alone does not provide a basis for the Debtor to establish that he is engaged in commercial or business activities on behalf of Aggregates.

## IV.     CONCLUSION

The Court, having examined the totality of the facts and circumstances in this case as well as the applicable law outlined above, concludes that the Debtor has not met his burden of establishing that he is a "debtor" within the meaning of Section 1182(1)(A). The Debtor personally is not engaged in commercial or business activities. The time and effort he volunteers to Ranch and the GWM Entities are not commercial or business activities. Finally, the Debtor did not establish that is engaged in commercial or business activities through Aggregates. Accordingly, the Court sustains Crusher's Objection and strikes the Debtor's Subchapter V Election.

—END OF OPINION—

---

[82] 635 B.R. 409 (Bankr. D. N.M. 2021).
[83] *Id*. at 421.
[84] *Id*.
[85] *Id*.